GEORGE C. BELL v. SMITH CONCRETE PRODUCTS, INC.; PRESTRESS-
ED CONCRETE, INC.; CATHARINE H. SMITH; RALPH L. WOOTEN;
JOHN E. KELLY; MABEL E. HARGETT; AND MARGARET B. MAR-
ROW, EXECUTRIX OF THE ESTATE OF T. F. MARROW, JR., DECEASED.

(Filed 15 January, 1965.)

**1. Specific Performance—**

Breach of contract to sell personal property ordinarily gives rise to an
action for damages, and an action for specific performance will not lie un-
less the injured party cannot be adequately compensated by a monetary
payment.

**2. Contracts §§ 1, 6—**

A stipulation in a contract giving each party the election to continue to
perform or to pay a specified sum for terminating the contract, is valid and
enforceable.

**3. Contracts § 12—**

Evidence of prior negotiations of the parties to a written agreement may
be competent for the purpose of throwing light on the intent of the parties.

**4. Specific Performance—**

A contract for the sale of unique personal property may not be specifically
enforced when the language of the agreement, considered in the light of
the prior negotiations between the parties, discloses the intent that each
party should have the option of paying a designated sum as liquidated dam-
ages instead of completing performance.

**5. Tender—**

Where the purchaser in a contract for the sale of unique personal prop-
erty, asserting his right to specific performance, refuses to accept a tender
by the seller of the amount of liquidated damages specified in the contract,
such refusal does not discharge the seller's obligation to pay the liquidated
damages, and judgment for such damages, and not a judgment of nonsuit,
should be entered upon the purchaser's failure to make out his case for
specific performance.

APPEAL by plaintiff from *Fountain, J.,* February 1964 Session of
LENOIR.

Plaintiff seeks, by this action, specific performance of defendants'
obligation to sell him the "business and assets" of corporate defendants
for the price and on the terms set out in his "proposal for purchase,"
dated November 14, 1962, accepted by corporate defendants and agreed
to by individual defendants on November 19, 1962.

At the conclusion of the evidence, the court allowed defendants' mo-
tion to nonsuit. Plaintiff excepted and appealed.

*Jones, Reed & Griffin for plaintiff.*

*LaRoque, Allen & Cheek, Charles Read Vincent and Wallace & Langley for defendant appellees.*

RODMAN, J. As a general rule, the remedy for a breach of contract for the sale of personal property is an action at law, where damages are awarded. *Rodgers v. Brock,* 156 N.C. 401, 72 S.E. 820; 17A C.J.S. 1008-9. To invoke equitable jurisdiction, it must appear that the party injured by the breach can not be adequately compensated by monetary payment. If that be so, specific peformance may be decreed. 49 Am. Jur. 6; 81 C.J.S. 408. Specific performance is decreed only when necessary to require one to do that which in good conscience he ought to do without court compulsion.

Business survives because it is normal for contracting parties to comply with their respective obligations. The normal response to an asserted breach is: "My obligation does not go to the extent you assert." To assure performance, it is not unusual to require a performance bond or to stipulate what sum will compensate for a loss resulting from a breach. In some situations the negotiating parties may forsee conditions which may make it desirable for them to have an election whether they will continue to perform or pay compensation for the privilege of terminating the contract. Such a stipulation in no way impairs the freedom to contract. It is valid and will be enforced. *Bradshaw v. Millikin,* 173 N.C. 432, 92 S.E. 161; Annotations, 32 A.L.R. 584; 98 A.L.R. 887; Specific Performance, 49 Am. Jur. § 43; 81 C.J.S. 51.

The rights and obligations of the parties to this litigation are fixed by plaintiff's "proposal for purchase" accepted by defendant corporations. That document must be interpreted to ascertain the extent of the rights and obligations of the respective parties. A proper interpretation can not be made without understanding the situation of the parties. This factual background sheds light on what the parties intended to accomplish. That intent is the heart of the contract. *Realty Co. v. Batson,* 256 N.C. 298, 123 S.E. 2d 744; *Stanley v. Cox,* 253 N.C. 620, 117 S.E. 2d 826; *Power Co. v. Membership Corp.,* 253 N.C. 596, 117 S.E. 2d 812; *De Bruhl v. Highway Commission,* 245 N.C. 139, 95 S.E. 2d 553; 17A C.J.S., Contracts, § 321.

Plaintiff and defendants offered, without objection, evidence relating to the situation of the parties, explanations made prior to delivery, of different portions of the tentative draft, and the reasons given for refusing to negotiate further.

These facts appear from the evidence: Smith Concrete Products, Inc. (Smith) and Prestressed Concrete Products, Inc. (Prestressed) are domestic corporations. Their offices and plants are located in Le-

noir County. Smith manufactures prestressed concrete blocks and miscellaneous building materials. Prestressed "manufactures a miscellaneous molding line of concrete products." Smith and Prestressed engage in the same general type of business. The plants of the two corporations are on adjoining properties. Catherine H. Smith, Ralph L. Wooten, John E. Kelly, Mabel E. Hargett, T. F. Marrow, Jr., owned, in the fall of 1962, all of the capital stock of both Smith and Prestressed. They constituted the Board of Directors of the corporations. Mrs. Smith owned a majority of the stock in each corporation. (The record does not disclose what percentage she owned, but it may be inferred she owned substantially more than a majority.) She acquired at least a portion of her stock from her deceased husband. She was president of each corporation.

All the negotiations leading to plaintiff's offer to purchase were with Mrs. Smith. She and her accountant wished to fix the fair value of her stock in the corporations, so that proper estate tax returns might be made. A contract serving Mrs. Smith's interest might be prejudicial to the remaining stockholders.

The corporations had earned a good name in the trade by the quality of their products. The process used by Smith and Prestressed differs from that used by other concrete companies.

Plaintiff moved to Kinston in the summer of 1962. He then learned that Mrs. Smith was interested in selling her stock in the corporations, or causing the corporations to sell their assets. He then asked for and was given financial statements for a period of five years. After a study of these statements, he informed Mrs. Smith that he was interested in purchasing. She suggested that he confer with Mr. Mitchiner, her attorney and financial adviser in these matters. Plaintiff had several conferences with Mr. Mitchiner and, with Mrs. Smith's consent, employed Mr. Mitchiner to assist him in preparing a plan which he would submit to Mrs. Smith as a basis on which he would purchase the corporate properties. Plaintiff examined the proposal as drafted by Mitchiner. He indicated changes which he desired to make. Thereafter, plaintiff, Mitchiner and Mrs. Smith met in plaintiff's office to consider the proposal as drafted by Mitchiner, and the amendments or changes which plaintiff desired to incorporate. The proposal, as then drafted, called for a sale of "the business and assets" of defendant corporations to plaintiff "or one or more corporations organized by him." The sale was to be made as of November 30, 1962. The purchase price would be the net book value of the assets as of November 30, 1962. (There is nothing in the record to indicate the approximate value of the assets and liabilities.) Plaintiff proposed to pay $50,000 in cash, the

balance to be evidenced by a note, or notes, bearing interest at 5% per annum, to be amortized over fifteen years, the first five payments to be made annually, the first on December 1, 1964. The balance was to be paid in 120 monthly installments. Payments of the note, or notes, would be secured by mortgage or deed of trust "on all the assets conveyed, including a valid assignment of leasehold   properties."

The offer expressly provided: As additional security, purchaser would be required to place all of his stock in escrow, but he would retain the exclusive right to vote the stock unless and until there was a default in the payment of some installment. "Adequate protective provisions shall be made in such instruments against bankruptcy, receivership, wasting of assets and/or otherwise which may prejudice such securities to the sellers."

"This offer to purchase shall exist and continue for a period of 10 days from the date hereof, and if not accepted within that period the same shall discontinue and be of no force and effect, whereupon the good faith deposit herewith attached shall be returned. However, if the same is accepted within that time, and for any reason other than death or physical disability to manage and operate the business, the purchaser shall fail to go through with or complete the purchase accordingly, such deposit herewith made shall be retained by the sellers as liquidated damages."

When plaintiff's first draft was discussed, Mrs. Smith inquired as to the meaning of the quoted paragraph relating to liquidated damages. She testified: "I asked him what it was and he explained to me what it was and Mr. Bell explained to me what it was, and Mr. Mitchiner, in my defense, felt that this gave Mr. Bell the privilege of withdrawing before December 1st if he so desired, but it did not give me any privilege. So that is written in here in long hand to be added to the next proposal * * * and that if I withdrew before November *(sic)* 1st, Mr. Bell had probably lost two weeks of work out there, had lost that amount of his time and they thought that [$2,000] was adequate compensation for that and he agreed to it, and Mr. Mitchiner had that put into the proposal. * * * [T]hey told me if for any reason I wanted to withdraw before December 1st they would act as they agreed, that I had the privilege of doing so by forfeiting my two thousand dollars."

The amendment to which Mrs. Smith refers, giving her the privilege "to withdraw before December 1st," incorporated in the draft submitted to and accepted by defendants, comes immediately after the provision giving plaintiff an option to pay liquidated damages. It reads: "Provided, however, that if sellers fail to go through with or

complete sale to purchaser, they will pay to purchaser as liquidated damages the sum of $2,000."

Defendant corporations were indebted to Small Business Administration. Incorporated in the final draft submitted to and accepted by defendants is this provision: "It is further understood that if the purchaser cannot remove the lien and agreements now existing with the Small Business Administration, the failure of the sellers to remove the same or secure SBA's consent to the purchase, such failure shall not give rise to the payment or forfeiture of the aforesaid $2,000. or $25,-000. liquidated damages."

Mr. Mitchiner, who acted as scrivener, testified: "[W]e had discussed at those two meetings the liquidating damage clause, and it was thoroughly understood by both of them that this agreement here, not agreement but proposal by Mr. Bell, was not a sales agreement; that if either of them wanted, or for any reason, failed to go through with the proposal after it was accepted, that the twenty-five thousand and two thousand dollars was to be the damages, which was felt to be what each side would have for their damages for failure to go through with the final sale, which was to take place on November 30th. That's what I understood, and I attempted to put it in here to that effect, and I also, in my precarious position of representing the seller, or proposed seller, Mrs. Smith and the companies, I wanted it understood, and we did have it understood, that this proposal did not incorporate the sales agreement, because there were so many things that had to be done." The last sentence in the above quotation manifestly refers to the concluding paragraph of plaintiff's proposal, which reads: "This offer or proposal is not intended to be all-inclusive as the terms and provisions of the entire purchase and security agreements, but to provide a basic understanding and agreements of such terms, conditions and provisions. As a good faith deposit, the purchaser has hereto attached and delivered herewith his check in the amount of $25,000. to support the offer and proposals herein made."

Defendants accepted plaintiff's proposal on November 19th. It is noteworthy that plaintiff testified that on that very day Mrs. Smith expressed "a hesitancy about selling the business to me." That hesitancy was based on the reluctance of defendants Kelly and Wooten to go along with the proposal. The directors of the corporations, or some of them, were disturbed about their continued employment and the ability of the corporations to continue to operate successfully without qualified personnel, experienced in production and sales. They did not challenge plaintiff's integrity or general business capacity, but main-

tained he had no experience in businesses similar to that done by corporate defendants.

A conference was held on November 29th for the purpose of agreeing on final details. Mrs. Smith then reminded plaintiff of the fact that on the 19th she had referred to the continued employment of trusted personnel, that she felt such continued employment essential to the success of the business, thereby assuring payment of the purchase money notes. Failing to secure satisfactory assurance with respect to personnel, she terminated the negotiations. The check for $2,000, payable to plaintiff, was tendered and refused.

Plaintiff, in describing the final conference, said: "Mr. Mitchiner told me that Mrs. Smith had decided not to sell the business, and related her reason for this was her concern over the fact that people would leave the business if I purchased it. After the conversation with Mr. Mitchiner the two of us went into the room where Mr. Sitterson was sitting with Mrs. Smith, and Mr. Mitchiner then went over the conversation he had had with me. I asked Mrs. Smith if that was her decision and she said 'yes,' and she briefly stated what Mr. Mitchiner had said, and I asked Mrs. Smith if that was her final decision and she said 'Yes' and then I left."

Unless we are to totally disregard uncontradicted testimony, it is clear that the parties understood that either, upon the payment of a specified sum, could be relieved of any obligation to the other. Because defendants had the right to terminate, plaintiff is not entitled to specific performance. He is, however, entitled to the sum fixed in the contract. His refusal to accept defendants' check does not discharge corporate defendants' obligation to pay. The court, instead of allowing the motion to nonsuit, should have entered judgment in favor of plaintiff against corporate defendants for two thousand dollars, as stipulated in the contract. The judgment will be modified to conform to this opinion.

Modified and affirmed.